UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DR. HEDY TASBAS,

                              Plaintiff,                        No. 06-CV-6236 CJS(P)

        -vs-

                                                               DECISION AND ORDER

R. JAMES NICHOLSON, SECRETARY OF
VETERANS AFFAIRS and DEPARTMENT
OF VETERANS AFFAIRS,

                              Defendants.
_____

APPEARANCES

For Plaintiff:            Nira T. Kermisch, Esq.
                          36 West Main Street, Suite 405
                          Rochester, New York 14614

For Defendants:           Kathleen M. Mehltretter
                          Acting United States Attorney
                          Western District of New York
                          by Christopher V. Taffe, Esq.
                          Assistant United States Attorney
                          620 Federal Building, 100 State Street
                          Rochester, New York 14614

INTRODUCTION

        This is an action alleging employment discrimination pursuant to Title VII of the

Civil Rights Act of 1964 ("Title VII), as amended, 42 U.S.C. § 2000e *et seq.*, and the

Equal Pay Act ("EPA"), 29 U.S.C. § 206(d).  Now before the Court is Defendants' motion

for dismissal and summary judgment. (Docket No. [#18]).  For the reasons that follow,

Defendants' application is granted and this action is dismissed.

1

BACKGROUND

On May 11, 2006, Plaintiff, Dr. Hedy Tasbas, M.D. ("Plaintiff"), commenced the subject action, alleging claims under the EPA and Title VII. Plaintiff's EPA claim alleges that she was paid less than a male doctor , with more seniority, who performed the same work. As for Title VII, Plaintiff asserts claims for hostile work environment and disparate treatment, on the basis of her gender and national origin, and retaliation. In that regard, Plaintiff's Title VII claims are based on the premise that her immediate supervisor, Dr. Shirish Patel ("Patel"), a male of Indian ancestry, harbored discriminatory animus toward her because she is an American woman. Plaintiff alleges that because of such animus, Patel subjected her to a hostile work environment, and treated her less-favorably than her foreign-male and foreign-female co-workers. Plaintiff's hostile-environment claim alleges that Patel exhibited hostility and contempt toward her by his speech and demeanor. Plaintiff's disparate treatment claim alleges that she was treated less favorably than males and non-caucasian females in two general respects: 1) she was singled out for criticism of her performance and/or judged by a double standard; and 2) she was forced to work harder. As for being singled out for criticism, Plaintiff alleges that Patel forced her to write lengthy chart notes for patients, and required her to use a template for writing such notes, but did not require male psychiatrists to do the same. Plaintiff also alleges that Patel blamed her for errors committed by male doctors, and falsely accused her of mis-treating a patient. Plaintiff contends that, based on such false accusations, Patel transferred her to a different facility temporarily, and then placed her on a performance improvement plan ("PIP"). Plaintiff further maintains that Patel selected her files for peer review, and attempted to manipulate the peer-review process

in order to insure unfavorable findings against her.   As for her contention that she was forced to work harder than her non-American colleagues, Plaintiff alleges that Patel assigned her more patients than her co-workers, failed to credit her for work that she performed, and refused to allow her to take time off for vacation.  Plaintiff also claims that Patel retaliated against her after she filed an EEO complaint in August 2002.  Specifically, Plaintiff alleges that following the EEO decision[1], Patel gave her a low performance rating, issued her a counseling letter regarding her use of sick leave, and assigned her all of the facility's new patients.

Following the commencement of this action, the parties conducted a significant amount of discovery.  Based on such discovery, and the entire record in this action, the following are the facts of the case, viewed in the light most-favorable to Plaintiff.  Plaintiff, a caucasian female psychiatrist of "Polish Lithuanian" descent who was born in the United States, began working at the Veteran's Administration Medical Center ("VAMC") in Canandaigua, New York, in June 1991.  At that time, in addition to Plaintiff, the VAMC employed two male psychiatrists.  Subsequently during the period at issue in this case, the VAMC employed several other psychiatrists, including females of South African, Dominican, Indian, and American descent.

In 1994, the VAMC hired Patel, a male of Indian ancestry, who was raised in Uganda and earned his medical degree in India, and who later immigrated to the United States.  On one occasion, during a period of a few months when Plaintiff was the acting Chief of Psychiatry at the VAMC, Patel told Plaintiff that he would not take orders from

---

[1]Plaintiff's complaint in this action specifically alleges that Patel began retaliating against her after March 8, 2005, when the EEOC issued a decision on one of her complaints. (Complaint ¶ ¶ 41, 119).

her because she was a woman. (Plaintiff's Affidavit ¶ 14).  On one other occasion during

that same period, Patel told a social worker, Sue Kaszynski ("Kaszynski"), that he would

not take orders from Plaintiff. *Id*. at ¶ 15.   Also, in or about 2002, Patel told a joke,

outside of Plaintiff's presence, that included a reference to a female as a "bitch."

In 1998, the VAMC promoted Patel to the position of Line Care Manager, a

supervisory position above Plaintiff and the other psychiatrists at the VAMC.

Approximately four years later, in or about January 2002, Patel spoke with Plaintiff about

a particular file in which he believed that Plaintiff had not provided appropriate

documentation. (Patel EEOC Affidavit at 27).  Specifically, Patel indicated that "critical

elements" of a psychiatric admission assessment, including medication history and

allergies, were missing, and that Plaintiff's "mental status examination [of the patient

was] grossly inadequate." (Defendants' Statement of Facts, Exhibit 5, at 706).

Subsequently, Patel identified another of Plaintiff's files, which he believed contained

inadequate documentation. (Patel EEOC Aff. at 29).  Patel stated that Plaintiff was "not

using [DSM-IV] criteria for diagnosis. . . .  She was not including admission status, shift

complaint, past history, family history, medication history, or allergies in the patient

diagnostic evaluation." (*Id*. at 35).   As a result, Patel placed Plaintiff on a preceptorship[2],

in which he instructed her "in medical documentation and clinical management of

cases." (*Id*. at 29).  The preceptorship consisted of several meetings between Patel and

Plaintiff.  As part of this preceptorship, Patel directed Plaintiff to use a particular format

---

[2]A "preceptorship" is "a period of training under a preceptor." MERRIAM WEBSTER'S MEDICAL DESK DICTIONARY (1993) at 569.  A "preceptor" is "a specialist in a branch of medicine or surgery who takes a young physician as a resident student and gives him personal training in his specialty." *Id*.

and template for recording information. (*Id*. at 32-37). According to Patel, all psychiatrists at VAMC were expected to follow the same format (*Id*), and he maintains that he counseled other psychiatrists besides Plaintiff on the use of appropriate documentation. (*Id*. at 39). Plaintiff, however, denies that male psychiatrists were required to provide the same type of documentation.

In or about February 2002, while the preceptorship was still in place, Patel and Plaintiff had their third preceptorship meeting, and Patel told Plaintiff that he would consider placing her on a PIP if her performance did not improve by their next meeting. (Patel EEOC Aff. at 43-45). Subsequently, according to Patel, Plaintiff's "clinical performance continued to remain unacceptable." (*Id*. at 49, 51). Specifically, Patel found that Plaintiff's cases showed "a consistent pattern of unsafe patient care." (*Id*. at 54). As examples, Patel noted cases in which Plaintiff had provided medication without obtaining blood tests or an EKG. (*Id*. at 54).

On or about March 25, 2002, Patel prepared Plaintiff's annual performance report, and rated her as "unsatisfactory" in the categories of examinations and diagnosis, "low satisfactory" in the area of therapeutic ability, and "satisfactory" in the areas of effectiveness in emergencies, patient management, and consultations and specialty skills. (Defendants' Stmt of Facts, Exhibit 33, p. 18). Patel's overall rating of Plaintiff's clinical competence was "low satisfactory." (*Id*.).

Patel discussed his concerns with the VAMC Chief of Staff, Dr. Babcock ("Babcock"), who recommended a "block peer review" of Plaintiff's cases. (Patel EEO

Aff. at 49, 51).[3]  In that regard,

> [p]eer reviews are a method of evaluation where providers grade other providers on their handling of a particular case.  A completed review bears a rating of Level 1, Level 2, or Level 3.  Level 1 means that most providers would have handled the case similarly, Level 2 that most providers *might* have handled the case in a different way, and Level 3 that most providers *would* have handled the case in a different way.

(Defendants' Memo of Law at 10).   Patel states that, to ensure objectivity, the VAMC chose doctors from other medical centers to conduct the block peer review. (*Id*. at 49-50).   According to the VAMC's Director of Human Resources, Joseph Olszewski ("Olszewski"), it was common in the Veteran's Administration system to send medical files to other facilities for peer review, particularly in cases arising in a small facility like VAMC. (Defendants' Statement of Facts, Exhibit 16 at 36).  Subsequently, a group of Plaintiff's cases were sent to the lead psychiatrist at the Buffalo VA facility, and another group was sent to the lead psychiatrist at the Syracuse VA facility. (Patel EEOC Aff. at 50).  Plaintiff alleges that Patel specifically sought to have her files reviewed by the lead psychiatrist in Buffalo, a female of Indian descent, because she was a friend of Patel's.[4]  However, the record indicates that Patel did not select a particular doctor to perform the reviews, but instead, requested the lead psychiatrists to have a peer review performed, either by the lead psychiatrists themselves or by one of their staff psychiatrists. (*Id*. at 51).  Some of the results from the reviews by the Buffalo medical center were

---

[3]Peer reviews of doctors' cases at VAMC were conducted by the Peer Review Committee, and Patel had no authority to assign individuals to conduct peer reviews. (Patel EEOC Aff. at 17).  In or about July 2001, another peer review was conducted on one of Plaintiff's cases. (Patel EEOC Aff. at 23).  Patel was not involved in that peer review. (*Id*.)

[4]In her Complaint in this action, Plaintiff states: "Upon information and belief, that Psychiatrist is a friend of Patel, and has been meeting with him on a regular basis for lunch and other occasions." (Complaint ¶ 77).  There is no evidence in the record to support this allegation.

designated as Level 2 or 3. *Id*. at 52.  Plaintiff admits that at least one of the cases that was reviewed in Buffalo was initially returned as a Level Two. (Defendant's Statement of Facts, Exhibit 8 at 178).  However, Plaintiff maintains that the poor ratings resulted from the fact that portions of files that were being viewed in isolation, and that when the files were examined in their entirety, she received a peer review rating of Level 1. (Plaintiff's Affidavit at ¶ 37).

At around this same time, Patel reviewed one of Plaintiff's cases, in which Plaintiff either placed a patient on medication, or continued a medication prescribed by another doctor, without conducting certain tests. (Defendant's Statement of Facts, Exhibit 5 at 780-783).  According to Patel, the patient was improperly receiving a medication that interfered with liver function, even though the patient's liver function tests were grossly abnormal. (*Id*. at 780, 815).  Patel further maintains that the same patient was also placed on a medication that had a "significant effect on the heart,"even though Plaintiff had not evaluated the patient's cardiac condition. (*Id*.)  Patel also contends that Plaintiff had placed the patient on medication that could increase the likelihood of a seizure, even though the patient had a history of seizures. (*Id*.)  Plaintiff, however, alleges that, with regard to the liver function tests, Patel "misunderstood the results of [the] liver test," because he "did not understand that there is a difference between test results of a liver test obtained after fasting, and test results of a liver test done after the patient ate." (Tasbas Aff. ¶ ¶ 48-49).  The basis for Plaintiff's allegation in that regard is unclear, although it is apparently due to her belief that Patel's Indian medical degree is not the equivalent of an American M.D. degree. (Plaintiff's Affidavit, ¶ ¶ 7-8) (Stating that Patel,

"who is from India, does not hold an M.D. degree but is a licensed physician in the State of New York. . . . [Patel] would have had to study a few more years in order to obtain an MD degree."); (*see also Id*. at ¶ 51) (Stating that Patel "has very limited medical knowledge.").

Subsequently, Patel met with Babcock, VAMC Human Resources, and VA Regional Counsel to discuss Plaintiff. (Patel EEOC Aff. at 52-53). Following that meeting, the VAMC decided to have Plaintiff's actions reviewed by an administrative body known as a Board of Investigation. (*Id*. at 53, 88). On or about June 5, 2002, during a meeting between Patel, Plaintiff, and Sharlene Sacco ("Sacco"), the VAMC Co-Line Care Manager, Sacco informed Plaintiff that she was being reassigned to the VA's Rochester Outpatient Clinic pending completion of the Board of Investigation. (*Id*. at 60). According to Patel, Babcock recommended the reassignment, and Sacco actually made the reassignment. (*Id*. at 88-89, 92). According to Sacco, she and Patel jointly made the decision, in consultation with Babcock. (Defendants' Statement of Facts, Exhibit 18 at 20). During the reassignment, which lasted approximately one month, Plaintiff was not permitted to provide patient care, and instead she performed "compensation and pension" assessments, which did not involve treatment or follow-up care. (Patel EEOC Aff. at 89-90, 92).

Subsequently, Babcock determined that, because of a change in the VAMC's human resources regulations, a Board of Investigation was not appropriate, and that the VAMC would instead address Plaintiff's alleged deficiencies through a PIP. (Patel EEO Aff. at 93) ("[T]he Board of Investigation was not the correct approach, or was no longer

an option. We would need to pursue [a] Performance Improvement Plan."). Consequently, in July 2002, Plaintiff was reassigned to her position at the VAMC in Canandaigua, and placed on a PIP. (*Id*.) The decision to place Plaintiff on a PIP was made by Patel, Sacco, "HR staff, the Risk Management Staff, and the Chief of Staff." (*Id*. at 94).

The PIP identified specific "critical elements that a provider ha[d] to address," such as conducting certain tests before starting medication. (*Id*. at 97). Specifically, Plaintiff's PIP identified three areas in which Plaintiff had to improve: 1) "rational prescription of psychotropic medications"; 2) "avoidance of polypharmacology"; and 3) "documentation." (Defendants' Statement of Facts, Exhibit 24). Patel was the person designated to oversee Plaintiff's performance under the PIP. (Patel EEOC Aff. at 98). PIPs generally lasted for a period of ninety days, however, Plaintiff's PIP remained in placed for a much shorter time, approximately one month, because she "clearly show[ed] incremental improvement." (Defendant's Statement of Facts, Exhibit 5 at 870-871).

Plaintiff alleges that Patel did not similarly criticize male doctors for problems with file notation, or for failing to conduct lab tests. However, Patel counseled Dr. H, a Korean male psychiatrist for problems with his file documentation. (Defendants' Statement of Facts, Exhibit 18 at 17-18). In that regard, Dr. H testified in relevant part:

> Q. Did you ever have occasion to see Dr. Tasbas use a template to do her documentation?
>
> A. I don't know what template you're talking about. There is guidelines, though. There are guidelines that you have to follow if you – if you would.
>
> Q. Did you follow those guidelines when you were doing your

documentation?

A. Tried to do if I – I have my own guidelines.  Most of the patients that – more than 30 years of practice [sic].  But I try to meet the criteria in the VA.  So, reasonable practice.

Q. Did there ever come a time if you didn't meet the criteria that Dr. Patel would counsel you on your documentation?

A. Of course.  He always does.  He was always picking on me.

Q. Would you say that Dr. Patel was particularly picky?

A. He is.  Little pickier than other chiefs in the past.

Q. Is he demanding with you and other providers?

A. Yes, he demands of me and other people, too. [sic]

Q. Would you say he was more demanding on women versus men, if you know?

A. I don't know.

Q. Did there ever come an occasion where you would see him being demanding with other male physicians?

A. He does to me.  So he probably to others. [sic]

(Kermisch Decl. Exhibit W at 740-741).[5]  Dr. H further testified that Patel counseled him regarding the need to conduct tests, such as EKGs, and that Patel's supervision irritated him:

Q. So what did he – how – what did he say during the counseling? . . .

A. Why didn't you do it.  And kind of – he does that.  He does that.  He does –

Q. I'm trying to find out what he said to you.

---

[5]The record also indicates that another male psychiatrist, Dr. G, was required to use a template to correct problems with his file documentation. (Defendants' Stmt of Facts, Exhibit 18, p. 18).

A. I can't exactly say.

Q. He would ask you?

A. He irritates me.

Q. Pardon?

A. Irritates me.

Q. Well, okay.

A. Because the small things is not a big deal, but he always mentions those things.  So that's why he irritates me because I don't like that kind of stuff.

***

Q. Does he have to talk to you a second time?

A. He does second time, yes.  Next time, he finds – yeah.  Every time review, he does. [sic]

Q. But does he ever talk to you about something, then you don't get it done and then he talks to you again about the same thing?

A. Yes, Ma'am.

Q. And then what happens?

A. Well, usually I do 99 percent.  Maybe 1 percent I fail and he bothers me, too.

Q. What do you mean by he bothers you?

A. Well, keep asking why you did not do it.  This is – you know, you can miss it.  Sometimes you can miss it, you get busy all day.  I'm not doing one thing.  I have to do many, many things.  So I can miss it and then [he] still bothers you.

(Kermisch Decl., Exhibit W at 748; see also, Defendants' Statement of Facts, Exhibit 6

at 10).

In or about July 2002, Plaintiff told Patel that she was going to file an EEOC

complaint, to "save her job." (Defendant's Statement of Facts, Exhibit 5, at 823; see

11

also, Patel EEOC Aff. at 15), indicating that he learned of Plaintiff's EEO complaint in September 2002). Subsequently, Plaintiff filed an EEO complaint, alleging that Patel was discriminating against her, based on age, sex, and national origin.

In 2002, Dr. H was absent from work for several months while attending to his wife, who was terminally-ill. (Defendants' Statement of Facts, Exhibit 11 at 730). Plaintiff was temporarily reassigned to handle Dr. H's cases. (Patel EEOC Aff. at 71-72). While she was covering Dr. H's cases, Plaintiff was relieved of her regular cases in the outpatient clinic. (*Id*. at 73; *see also, Id*. at 75) ("Dr. Tasbas, by assuming the patients that [Dr. H] was to have seen, was not seeing his patients over and above her workload, her normal workload. She did not have any extra patients on top of those. So, basically, what changed here was just the label of the clinic."). Because the assignment was temporary, Dr. H's name was kept on the patient files. (*Id*. at 72). In that regard, the Clinic Coordinator, Michael Freeman ("Freeman"), indicated that they did not change provider names on the files, because otherwise the VAMC would have had to send out letters to all of Dr. H's patients, informing them of the change. (Defendants' Statement of Facts, Exhibit 14 at 15). Nevertheless, Freeman maintains that Plaintiff was personally credited for any work that she performed on Dr. H's files, because she would have been designated at the "primary provider" for any patient encounter. (*Id*.)[6];( *see also*, Patel EEOC Aff. at 73) ( "[S]he would have received credit for it because on the encounter

---

[6]"[Dr. H's] name remained on the clinic, per se. However, Dr. Tasbas' name was the one who was given credit for the work that was being done. She was listed as the primary provider for that clinic. So if a person came in, a John Doe arrived and says, I have an appointment at [Dr. H's] clinic at 1:00, they were informed that Dr. Tasbas was temporarily taking over for [Dr. H]. They would go in and see Dr. Tasbas. She would fill out the encounter form and check off the box that said primary provider, which is Dr. Tasbas, and then she would be given credit." (*Id*. at 15-16).

form, the primary provider is identified as the person seeing the patient, not under whose clinic the patient is being seen."); (*see also, Id*.) ("When we quantify workload, we look at the encounters. These encounters are filled by individual providers and has nothing to do with the clinic."); (Defendant's Statement of Facts, Exhibit 5, at 869). Nevertheless, Plaintiff insists, in conclusory fashion, that she was not "credited" for the work that she performed on Dr. H's files.

In January 2003, Patel stepped down as Co-Line Care Manager, leaving Sacco as the VAMC Line Care Manager. Sacco became aware of Plaintiff's EEOC complaint in aproximately early May 2003. As Line Care Manager, Sacco had supervisory authority over the psychiatrists' administrative issues. (Patel Dep. at 30). Patel, as lead psychiatrist, continued to supervise the psychiatrists and managed the clinical programs.

Patel was not involved in the assignment of patients to particular psychiatrists at the Mental Health Clinic. (Patel EEOC Aff. at 72). Instead, such assignments were made by Freeman. (*Id*.; *see also*, Defendant's Statement of Facts, Exhibit 9) (Assignment of Patients and maintenance of provider's panel are Freeman's responsibility). At some point after January 2003, Plaintiff complained that her patient caseload was calculated incorrectly. Plaintiff complained to Patel regarding her patient caseload on approximately two occasions. (Patel Dep. at 31, 37). On one occasion, Patel referred Plaintiff to Sacco, since Sacco was already handling that issue. (Patel Dep. 27-28).[7] On another occasion, Patel referred Plaintiff to Freeman. (Patel Dep. at 31). Patel did not personally take any further action with regard to Plaintiff's complaint

---

[7]Subsequently, Sacco issued a directive, preventing the psychiatrists from accessing each other's patient lists. (Patel Dep. at 28-29, 37).

about how that patient caseloads were calculated. (*Id.*)

In December 2005, Freeman informed the psychiatrists of their current caseloads. Specifically, Freeman calculated that Plaintiff had the lowest number of patients, 328, while a male psychiatrist had 388 patients, and another female psychiatrist had 394 patients. (Defendants' Statement of Facts, Exhibit 27). At that same time, Freeman redistributed cases among the psychiatrists. Specifically, Freeman took all "day treatment patients and MHICM[8] patients" assigned to Plaintiff and another psychiatrist, and reassigned them to a third psychiatrist, who was apparently newly hired, and who would "see these patients as 'new patients' to her panel and would provide a 'new' intake interview (60 minutes) to be introduced to their specific history." (Defendants' Statement of Facts, Exhibit 13, Freeman Affidavit at 3). Freeman states that subsequently, in order to equalize the doctors' caseloads, he assigned Plaintiff most of the "'new' patients coming into the . . . clinic for the first time given that [Plaintiff] had the lowest number of patients in her panel." (*Id.*) Freeman further states that Dr. H also received some new patients, but fewer than Plaintiff, because he was "already carrying a full panel load of patients." (*Id.* at 4).

Plaintiff, however, maintains that Freeman's claim, that she had the fewest number of patients, is false. In that regard, Plaintiff told Freeman that his accounting inaccurately omitted 54 patients from her patient list, and that Dr. H's list was inflated, because it included deceased patients. (Defendants' Statement of Facts, Exhibit 29). Freeman, though, checked, and determined that only five patients had been omitted

---

[8]It is unclear what this acronym means.

from Plaintiff's lists, and that forty-nine of the patients that Plaintiff believed had been omitted from her list actually were included on her list. (*Id*.) Additionally, Freeman confirmed that Dr. H's panel did not include deceased patients. (*Id*.)

Nevertheless, on or about December 23, 2005, Plaintiff filed a supplemental affidavit in support of her EEO complaint, stating, in relevant part: "I believe that management, Dr. Patel, Mike Freeman, Dr. Babcock , are altering the bookkeeping and records to make it appear that I have been the most unproductive/incompetent physician, a total misrepresentation of who I am and all that I have done and accomplished in terms of workload and patient care. " (Kermisch Decl., Exhibit H).

On or about December 30, 2005, Plaintiff and Patel met to review Plaintiff's performance review. (Kermisch Decl., Exhibit H). Patel gave Plaintiff an overall satisfactory rating, but a "low satisfactory" rating for dependability. The "low satisfactory" rating for dependability was based on the fact that Plaintiff allegedly had taken too many sick days. In that regard, previously, on or about March 22, 2005, Patel had issued Plaintiff a written letter of counseling regarding abuse of sick leave, because, during the preceding years, she had taken "10 days of unscheduled leave and three of those days were either on a Friday or Monday." (*Id*.)[9] Plaintiff, in conclusory terms, denies that she abused the sick leave policy, and contends that the poor rating was retaliatory. During her meeting with Patel, Plaintiff also complained that the work was not divided equally.

---

[9]Patel maintains that previously, on or about June 1, 2004, he gave Plaintiff a verbal counseling regarding abuse of sick leave procedures. (Defendants' Statement of Facts, Exhibit 7). In that regard, Patel indicated, for example, that "between January 1, 2003 and June 1, 2004, 17 out of her 17 sick days were unscheduled leave and they were taken sporadically, i.e., she would call in at the last minute to request leave," and Patel "noticed that several of these calls were Monday and Friday mornings." *Id*. Patel further states that, at around that same time, he also gave a verbal warning to Dr. H concerning sick-leave abuse. *Id*. Plaintiff denies that Patel gave her such a verbal counseling.

Specifically, Plaintiff described her discussion with Patel as follows, in relevant part:

> I then said that the workload data/patient panels have been totally
> inaccurate for a long time.  He said that "He was not aware of it."  He then
> asked me, Well, aren't you handling this with Sherry Sacco [?] . . . .  I said
> that I did but it was still not resolved.  I said that "He should be handling
> this since it is part of my proficiency.  He then said that "He does not
> handle the data!    I then said then Why are you in charge of my
> proficiency.  You are just accepting of the figures that you are given and do
> not care to respond to my questions?  I tried to state my stance and that is
> "The numbers do not reflect my actual workload."  He did not let me finish
> my sentence and in my trying to emphasize these facts, he began to get
> hostile and then said that "I was being insubordinate! [sic]

(Kermisch Decl., Exhibit H).  Notably, for the same evaluation period, Patel also rated

Dr. H as "low satisfactory" for dependability, because Dr. H "had a pattern of excessive

unscheduled sick leave usage during the rating period." (Defendants' Stmt. Of Facts,

Exhibit 10, p. 6).

Following discovery, on August 29, 2008, Defendants filed the subject motion to

dismiss and for summary judgment.  Defendants maintain that the Court lacks subject

matter over the EPA claim, pursuant to 28 U.S.C. § 1346(a)(2), since Plaintiff's claim is

against the United States and seeks damages in excess of ten thousand dollars.

Defendants also contend that Plaintiff's Title VII claims lack merit.  More specifically,

Defendant maintains that Plaintiff cannot demonstrate a prima facie hostile work

environment claim, because the alleged harassment was neither sufficiently severe or

pervasive, nor related to her gender or national origin.  Defendant also contends that

Plaintiff cannot demonstrate a prima facie case of disparate-treatment discrimination,

because she was not a satisfactory employee, suffered no adverse employment action,

and cannot demonstrate an inference of discrimination.  Similarly, Defendant states that

Plaintiff cannot prevail on her retaliation claim, since she cannot demonstrate an

adverse employment action or retaliatory motive/causal nexus.

On January 14, 2009, Plaintiff filed opposing papers, contending that the Court has jurisdiction over her EPA claim, and that her Title VII claims are meritorious. In support of her Title VII claims, Plaintiff submitted an affidavit that consists largely, if not entirely, of conclusory statements. For example, she states that: 1) "Patel has prejudices against women in general, and American women in particular"; 2) "[Patel] does not want any female to work with him. However, he is willing to work with Indian or other foreign females to who he feels superior, but cannot feel superior to an American woman"; 3) she was "harassed on an almost daily basis because of [her] gender and/or national origin by Patel"; 4) "Defendants manipulated the panel size so that it would show that [she] had the least number of patients"; 5) "in 2002, . . . [she] covered for a male psychiatrist, [Dr. H], and had to see all his patients", and "[i]nstead of having the patients [she] saw credited to [her] panel, the credit . . . was given to [Dr. H]"; 6) she "had and still [has] a heavier burden than male psychiatrists"; 7) "male psychiatrists were not subjected to [peer reviews]; 8) "[i]n one [peer review] case Patel sent out of context information to a friend of his, an Indian psychiatrist in Buffalo, and she found fault with [Plaintiff's] handling of the case," but "when the case was reviewed as a whole and not just one portion taken our of context, it was determined that [Plaintiff's] handling of the patient was very satisfactory"; 9) she "was criticized on a regular basis for not writing very detailed notes, . . . while [Dr. H], for example, used to write two or three lines, and was never criticized"; and 10) "[m]ale psychiatrists . . . were never reprimanded for their errors." (Plaintiff's Affidavit, Docket No. [# 25]).

Plaintiff further relies on various deposition testimony by female employees at the

VAMC, most of which is also conclusory.  For example, Bonnie White ("White"), a counseling therapist in the Behavioral Health Clinic at the VAMC, stated that male psychiatrists at the VAMC "received more privileges" and didn't "have to work as hard" as Plaintiff. (Kermisch Decl., Exhibit A at 14.  White also stated that Dr. H was "allowed to take off any time he want[ed] to." (*Id*. at 16).  White further opined that Patel "is an Indian and he has very much the cultural attitude of the caste system and very much against women and very much against Americans," and that Plaintiff "is the most American appearing woman up here." (*Id*. at 18).  White added that Plaintiff would complain about her workload during staff meetings, and that Freeman and Sacco would respond to her in a "nasty" way: "Dr. Tasbas would bring up in staff meetings the unfairness of the allocation of duties and to Mike Freeman and Sherry Sacco.  And both of them would get very nasty in staff meetings, very livid and say, you either talk to us about this in my office alone. [sic] That type of treatment.  Or very intimidating [sic]." (Kermisch Decl., Exhibit G at 382).  White stated, though, that she never observed any interaction between Plaintiff and Patel: "Q. Did you see any interaction between Dr. Tasbas and Dr. Patel? A. Nothing directly, no. . . .  I don't ever remember him really saying anything to her." (*Id*. at 387). White further stated, with sarcasm, apparently, that Plaintiff never was allowed to take time off, "unless she would pass out from exhaustion." (*Id*. at 384).  When asked to clarify her comment about Plaintiff passing out from exhaustion, White stated only that she observed Plaintiff become "frazzled" on approximately "ten" occasions. (*Id*. at 385).

Paula Daines ("Daines"), a registered nurse in the Behavioral Health Outpatient

Clinic at the VAMC, stated that "those of a different background seem to be treated better" at the VAMC. (Kermisch Decl., Exhibit B at 3-6).  When asked to explain that comment, Daines stated: "I guess I'm referring to the Pakistan, Indian, that background; also Asian, because that's the new kid on the block that seems to be treated much better." (*Id*. at 6).  When asked to explain how Indian and Asian employees were treated better, Daines stated:

> Well, I'm not even sure if its – I think the ethnic background has something to do with it, but I definitely think it also has to do with the fact that they are males as opposed to females.  They are not watched as closely as far as their work goes.  They are not watched as closely as far as their time goes.  Their panels are much smaller.  They seem to be getting more breaks.  And I – I cannot verify it, because I haven't seen their pay, but I think they get paid more, too, given the time that they're here, compared to [Plaintiff].

(*Id*. at 6-7).  Daines admitted, however, that she did not have access to the doctors' patient lists, and that she based her opinion of the doctors' caseloads on her observation of the number of patients that the doctors saw per day. (*Id*. at 7).  Daines also stated, though, that Plaintiff sometimes saw more patients than other doctors because the patients specifically requested to see her. (*Id*. at 7-8).

Barbara Russak ("Russak"), a psychiatric nurse practitioner for the substance abuse services program at VAMC, stated that on one occasion she observed that Dr. H had written an initial psychiatric assessment that was only two lines long. (Kermisch Decl., Exhibit C at 11, 14 ).  Russak stated that the assessment was deficient because it omitted a history of the patient's illness, a diagnosis, a plan of care, and medications. (*Id*.)  Russak also stated that she believed Plaintiff was "held to a higher standard than other psychiatrists." (*Id*. at 15-16).  When asked to explain why she believed that,

Russak stated: "Just looking at the type of documentation that they are saying they require for performance. If I compare the documentation of the two psychiatrists, [Plaintiff] provided documentation that was expected and should have been included, where the other psychiatrist [Dr. H] didn't." (*Id*. at 16). Russak also stated, with regard to an incident in March 2002, when Plaintiff was required to stay beyond her shift to attend to a patient, "Well, I don't know if other male psychiatrists would have been required to do that. That is just my opinion with that." (*Id*. at 18).[10]

Rebecca Deburgomaster ("Deburgomaster"), a registered nurse at the VAMC, stated that Plaintiff "appeared" to have a larger panel of patients than other doctors, although she could not explain why that appeared to her to be the case. (Kermisch Decl., Exhibit D at 3, 6-7) ("I don't know whether it's just the years that she's been here or – because she's been here a lot of years."). Deburgomaster stated that the assignment of new patients was the responsibility of her supervisor, Freeman. (*Id*. at 7). Deburgomaster stated that she thought that males were possibly treated better than females at the VAMC: "I think sometimes . . . . I– I don't know. From what I've see, maybe it's more lenient with the males that it is with the females." (*Id*. at 12). Deburgomaster added that she "seldom" saw Patel at the VAMC. (*Id*. at 7).

And finally, Dr. Susan Sharza ("Sharza"), a female physician at the VAMC, stated that, in her opinion, Patel "just didn't treat women well," and that on one occasion, he referred to her as "Susan" to a patient, rather than as "Dr. Sharza." (Kermisch Decl.,

---

[10]With regard to this incident, Plaintiff had alleged that, on one occasion when she had worked through the night, Patel had denied her request to leave work early the following day. However, the record indicates that Plaintiff never made such a request to Patel.

Exhibit E at 335, 339-340, 342).[11]

Counsel for the parties appeared before the undersigned for oral argument on April 9, 2009. The Court has thoroughly considered the parties' written submissions and the arguments of counsel.

ANALYSIS

*Motion to Dismiss EPA Claim Pursuant to Rule 12(b)(1)*

The standard to be applied on a motion to dismiss for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) is well settled:

> A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it. In resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court, as it did here, may refer to evidence outside the pleadings. A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.

*Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000) (Citations omitted).

Defendants maintain that this Court lacks jurisdiction over Plaintiff's EPA claim pursuant to 28 U.S.C. § 1346(a)(2), which provides, in relevant part, that district courts have subject matter jurisdiction, concurrent with the U.S. Court of Federal Claims, over civil actions against the United States based upon "any Act of Congress," "not exceeding $10,000 in amount." The instant EPA claim seeks more than ten thousand dollars in damages, and Plaintiff concedes that, ordinarily, the Court would lack jurisdiction over her EPA claim. However, she contends that pursuant to 28 U.S.C. § 1500, the Court has

---

[11]In her affidavit, Plaintiff states, "I have been treated differently than males, as were other American female physicians." (Plaintiff's Aff. [#25] [ar 11]. It is unclear what other American female she is referring to, unless it is Sharza.

subject matter jurisdiction over the EPA claim, since it is joined with a Title VII claim.   In

this regard, Plaintiff cites *Moorehead v. U.S.*, 81 Fed. Cl. 353 (2008), where an EPA claim

brought in the Court of Federal Claims was dismissed, pursuant to 28 U.S.C. § 1500,

since it arose from the same operative facts as a Title VII claim that had previously been

filed in a U.S. district court. *Id.* at 355 ("[S]ection 1500 divests the Court of jurisdiction over

any claim 'for or in respect to which the plaintiff . . . has pending in any other court any suit

or process against the United States . . . .   For section 1500 to apply to divest this Court of

jurisdiction over Ms. Moorehead's claim, she must have filed the same claim that is now

pending here . . . in another court, and that claim must have been pending in that other

court at the time that Ms. Moorehead's claim was effectively filed in this Court.") (citations

omitted).

However, neither 28 U.S.C. § 1500 nor the *Moorehead* decision expands this

Court's limited jurisdiction under 28 U.S.C. § 1346(a)(2).   Consequently, the Court finds

that it lacks jurisdiction over Plaintiff's EPA claim.   Moreover, the claim, in any event,

lacks merit.   In that regard, although Plaintiff alleges that she and Dr. H received different

salaries for several years for performing the same work, the discrepancy was based upon

years of service.   Specifically, Dr. H , who became employed by the VA in 1976, was a

Grade 15, Step 10, while Plaintiff, who was hired by the VA in 1991, was a Grade 15, Step

8. (Plaintiff's Affidavit, Exhibits A & B).   Plaintiff's salary eventually matched Dr. H's when

she herself reached Grade 15, Step 10, based on her years of service.   Accordingly,

Plaintiff's EPA claim is dismissed.

*Rule 56*

Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See, Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "[T]he movant must make a prima facie showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.).  "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*, 75 F.3d 98, 107 (2d Cir. 1996)(*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)), *cert denied*, 517 U.S. 1190 (1996).  Once that burden has been established, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  To carry this burden, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The parties may only carry their respective burdens by producing evidentiary proof in admissible form. FED. R. CIV. P. 56(e).  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  Summary judgment is appropriate only where,

"after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997)(citations and internal quotations omitted). Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001). Moreover, a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985), *cert. den*. 474 U.S. 829.

*Title VII*

Title VII "makes it unlawful for an employer to discriminate against any individual with respect to the 'compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Richardson v. New York State Dep't of Correctional Servs.*, 180 F.3d 426, 436 (2d Cir. 1999)(citations omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006). However, "Title VII does not establish a 'general civility code' for the American workplace. Simple teasing, offhand comments, or isolated

incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment." *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citation omitted).

*Hostile Environment*

To establish a claim of hostile work environment discrimination, a plaintiff must show that

> the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. The plaintiff must show that the workplace was so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered. Proving such a claim involves showing both objective and subjective elements: the misconduct shown must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive.

> In addition, the plaintiff must show that a specific basis exists for imputing the objectionable conduct to the employer. Where an employee is the victim of sexual harassment, including harassment in the form of a hostile work environment, by non-supervisory co-workers, an employer's vicarious liability depends on the plaintiff showing that the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action. According to two 1998 Supreme Court cases, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), this inquiry differs where the harassment is attributed not to non-supervisory co-workers but to a supervisor with immediate or successively higher authority over the employee. *Burlington Indus.*, 524 U.S. at 765, 118 S.Ct. 2257; *Faragher*, 524 U.S. at 807, 118 S.Ct. 2275. In that circumstance, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee. If it did, the employer will, ipso facto, be vicariously liable. If no such tangible employment action is present, however, an employer will still be liable for a hostile work environment created by a supervisor unless the employer successfully establishes an affirmative defense. That defense requires the employer to show that (a) it exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) the plaintiff employee unreasonably failed to take advantage of any preventive

or corrective opportunities provided by the employer or to avoid harm otherwise.

*Fairbrother v. Morrison*, 412 F.3d 39, 48-49 (2d Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d 199 (2nd Cir. 2006).

The law to be applied when considering whether conduct was sufficiently severe and pervasive is well settled:

> Although isolated incidents ordinarily will not rise to the level of a hostile work environment, even a single incident of sufficient severity may so alter the terms and conditions of employment as to create such an environment. The matter of whether the conduct alleged was so severe or pervasive as to create an objectively hostile or abusive work environment, is to be decided based on the totality of the circumstances, in light of such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. Where reasonable jurors could disagree as to whether alleged incidents of . . . harassment would have adversely altered the working conditions of a reasonable employee, the issue of whether a hostile work environment existed may not properly be decided as a matter of law.

*Patterson v. County of Oneida, N.Y.*, 375 F.3d 206, 227 (2d Cir. 2004) (citations and internal quotations omitted).

Defendants contend that Plaintiff cannot prove a hostile work environment, since the evidence shows only that Patel told a sexist joke outside of Plaintiff's presence in 2002, and that Plaintiff perceived Patel as using a "hostile" and "demeaning" tone of voice toward her. In response, Plaintiff stated: "I have been harassed on an almost daily basis[12] because of my gender and/or national origin by Patel, and my complaints to his

---

[12]Plaintiff's assertion that Patel harassed her on a daily basis is belied by her witnesses' testimony, which suggests that Patel was rarely around, and by her own testimony, in which she indicated that Patel rarely spoke to her.

supervisors were ignored." (Plaintiff's Affidavit ¶ 16). However, when the Court asked

Plaintiff's counsel, during oral argument, how such conclusory assertions could establish a

hostile environment claim, counsel responded that Plaintiff's claims were more properly

classified as disparate treatment and retaliation. The Court agrees, and finds, as a matter

of law, that Plaintiff has not come forward with sufficient evidentiary proof in admissible

form to support a hostile environment claim. Accordingly, Defendants are entitled to

summary judgment on the hostile environment claim.

*Disparate Treatment*

Disparate treatment discrimination claims are analyzed using the well-settled

*McDonnell Douglas*[13] burden-shifting framework:

> A plaintiff establishes a prima facie case of discrimination by showing that he
> or she (1) is a member of a protected [group] . . . .; (2) was qualified to
> perform the duties required by the position; (3) was subjected to an adverse
> employment action; and (4) the adverse employment action occurred in
> circumstances that gave rise to an inference of discrimination. *See Terry v.
> Ashcroft*, 336 F.3d 128, 138 (2d Cir.2003).
>                                      ***
> Once the plaintiff presents a prima facie case[14], the burden of production
> shifts to the defendant to articulate a legitimate, non-discriminatory reason
> for its employment decision. *See Texas Dep't of Cmty. Affairs v. Burdine*,
> 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Upon the
> defendant's articulation of a legitimate, non-discriminatory reason, the
> presumption of discrimination arising from the plaintiff's prima facie showing
> " 'drops out of the picture,' " *Reeves v. Sanderson Plumbing Prods.*, *Inc.*,
> 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (*quoting St.
> Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d
> 407 (1993)); *see Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d
> Cir.2000), and the burden of production shifts back to the plaintiff to adduce

_____

[13]*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 36 L.Ed.2d 668
(1973).

[14] "A plaintiff's burden of establishing a *prima facie* case is *de minimis*. The requirement is neither
onerous, nor intended to be rigid, mechanized or ritualistic." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239
F.3d at 467 (citations and internal quotation marks omitted).

evidence sufficient for a reasonable jury to conclude that discrimination was a reason for the employment action, *see Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000). In deciding a motion for summary judgment, the court is to examine "the entire record to determine whether the plaintiff could satisfy [her] 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Id*. at 90 (*quoting Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Thus, summary judgment is appropriate when the plaintiff "has presented no evidence upon which a reasonable trier of fact could base the conclusion that [discrimination] was a determinative factor" in the defendant's employment decision. *Schnabel*, 232 F.3d at 91.

*Butts v. NYC Dept. of Housing Preservation and Dev.*, No. 07-1930-cv, 307 Fed.Appx. 596, 2009 WL 190403 at *1-2 (2d Cir. Jan. 28, 2009); *see also, Terry v. Ashcroft*, 336 F.3d at 138 ("[O]nce the defendant has made a showing of a neutral reason for the complained of action, to defeat summary judgment the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination.") (citations and internal quotations omitted).

Here, Defendants maintain that Plaintiff cannot establish the third and fourth elements of a prima facie case.[15]  With regard to the third element of a plaintiff's prima facie case,

[a]n 'adverse employment action' is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of materially adverse changes include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Terry v. Ashcroft*, 336 F.3d at 138 (citations and internal quotation marks omitted). "[T]he finding of an adverse employment action is a heavily fact-specific, contextual

---

[15]During oral argument, Defendants' counsel admitted that Plaintiff is a member of a protected class, and stated that there is a triable issue of fact as to whether Plaintiff was qualified.

28

determination." *Zelnik v. Fashion Institute of Technology*, 464 F.3d 217, 228 (2d Cir. 2006) (citation and internal quotation marks omitted).  In deciding whether an employment action is sufficiently adverse,  the plaintiff's subjective beliefs are irrelevant. *Gelin v. Paulson*, No. 05-6043-cv, 234 Fed.Appx. 5, 2007 WL 1366325 at *7 (2d Cir. May 10, 2007) (Finding that an objectively positive performance evaluation was not an adverse employment action, the court observed that Title VII's "provisions for judging harm must be objective," and accordingly, the court found that the plaintiff's "subjective belief that he was 'downgraded' [was] irrelevant.") (citations omitted).

As for the fourth element of the plaintiff's prima facie case, the plaintiff must show that the adverse action occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class.  In that regard,

> the inference of discriminatory intent could be drawn in several circumstances including, but not limited to: the employer's continuing, after discharging the plaintiff, to seek applicants from persons of the plaintiff's qualifications to fill that position; or the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group; or the sequence of events leading to the plaintiff's discharge.

*Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 468 (citation omitted).  As for invidious comments, "stray remarks of a decision-maker, without more, cannot prove a claim of employment discrimination," however, "when other indicia of discrimination are properly presented, the remarks can no longer be deemed 'stray,' and the jury has a right to conclude that they bear a more ominous significance." *Id*. (citations and internal quotation marks omitted).

Assuming that the plaintiff establishes a prima facie case, and that the defendant provides a non-discriminatory reason for the employment action, at the third tier of the *McDonnell Douglas* test, the plaintiff is required "to produce sufficient evidence to support a rational finding that the non-discriminatory business reasons proffered by the defendant for the challenged employment actions were false." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d at 470. If the plaintiff succeeds, such evidence may, or may not, establish the additional required proof of discriminatory intent:

> The ultimate question is whether the employer intentionally discriminated, and proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason is correct. In other words, it is not enough to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.

*James v. New York Racing Ass'n*, 233 F.3d 149, 156 (2d Cir. 2000) (*quoting Reeves v. Sanderson Plumbing Prods. Inc.*, 120 S.Ct. 2097, 2108-09 (2000)). In this regard, "[t]he relevant factors . . . include the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports or undermines the employer's case." *Id.* (internal quotation marks omitted).

Applying the foregoing principles of law to the facts set forth above, the Court observes, at the outset, that it is doubtful whether the alleged employment actions set forth by Plaintiff were sufficiently adverse to support a prima facie case. On this point, there is no indication that Plaintiff suffered any tangible adverse effects, such as a demotion, loss of promotion, or decrease in salary. In fact, Plaintiff admits that during the relevant period, her salary was increased to match Dr. H's salary. Nevertheless, the Court will assume, *arguendo*, that Plaintiff has demonstrated an adverse employment action.

Similarly, the Court will assume, *arguendo*, that Plaintiff has demonstrated that the adverse employment actions occurred in circumstances giving rise to an inference of discrimination, although Plaintiff's showing as to this requirement for a prima facie case is also weak.    She relies on two stray remarks by Patel, to the effect that he would not take orders from a woman, made years prior to the events at issue in this case, and a sexist joke that Patel told outside of Plaintiff's presence, as well as her conclusion that she was treated differently than male- and non-American-female psychiatrists.  However, the record indicates that, apart from being temporarily transferred to another clinic, and then being placed on a PIP, she was not treated differently.[16]

Having found that Plaintiff meets the low threshold required to establish a prima facie case, the Court finds that Defendants have met their burden of providing non-discriminatory reasons for the complained-of actions.  Specifically with regard to issues such as file documentation and patient care, Defendants have produced evidence that actions such as  the preceptorship, peer review, temporary reassignment, and PIP, were warranted by Plaintiff's unsatisfactory job performance.  As for issues related to Plaintiff's workload and case assignments, Defendants have produced evidence that the workload was divided among the psychiatrists based on factors that have nothing to do with Plaintiff's gender or ethnicity.

Plaintiff insists that Defendants' stated reasons are false.  However, as already discussed, Plaintiff has not provided evidentiary proof in admissible form to support her

---

[16]In her Complaint in this action, Plaintiff also alleges: "On many occasions Plaintiff was denied leave, while male psychiatrists could take as much time off as they wanted, leaving Plaintiff without help to treat a large number of patients." (Complaint ¶ 92).  This conclusory allegation is without support in the record.

argument.  At most, Plaintiff has established, based only on her own affidavit, that Patel was wrong to conclude that her patient's liver-function tests were abnormal.  Even assuming that to be true, Plaintiff attributes Patel's error to his lack of medical training, as opposed to any discriminatory animus. *See*, Plaintiff's Memo of Law at 16 ("The problem in that case was Patel's lack of knowledge of general medicine.  Patel did not understand that there is a difference between test results of a liver test obtained after testing, and test results of a liver test done after the patient ate.").

Assuming, again *arguendo*, that Plaintiff could demonstrate that the reasons for the actions taken against her were false, she has not raised any inference that discriminatory animus was a motivating factor.  In that regard, Plaintiff's case theory is that Patel took all of the various actions against her because he personally disliked American women. However, apart from the stray remarks discussed in connection with Plaintiff's prima facie case, Plaintiff has not provided evidence that Patel was actually motivated by such animus. Moreover, the record indicates that Patel was not involved in many of the actions about which she complains.  For example, it was Freeman, not Patel, who calculated Plaintiff's caseload and assigned her new patients.  Similarly, the decisions to initiate a Board of Investigation, as well as the resulting temporary reassignment and placement of Plaintiff on a PIP, were not made by Patel alone, but were made by groups of decisionmakers at VAMC, including Sacco and Babcock.  Plaintiff has not alleged, much less shown, that any of those individuals had discriminatory animus toward her. *See*, Plaintiff's Memo of Law at 2 ("*The person* who harassed and discriminated against Plaintiff was and is Shirish Patel[.]") (emphasis added).  Nor has Plaintiff shown, with evidentiary

proof in admissible form, that those groups merely "rubber stamped" Patel's recommendations. *See, Fullard v. City of New York*, 274 F.Supp.2d 347, 357 (S.D.N.Y. 2003) ("The discriminatory animus of intermediate supervisors who have input in the decisionmaking process will not give rise to liability if the supervisor with final authority bases an adverse employment action exclusively on an independent evaluation. But the employer will be liable where the decision-maker 'rubber stamps' the recommendation of the subordinates; in such cases, we say that the decision-maker acts as a conduit of the subordinates' improper motive.") (citations and internal quotation marks omitted). There is also no evidence that Patel hand-picked doctors to provide negative peer reviews of Plaintiff's cases.

Having carefully considered the entire record, the Court finds that Plaintiff has failed to carry her burden at the third step of the *McDonnell Douglas* analysis. Accordingly, Defendants are entitled to summary judgment on the disparate treatment claim.

### Retaliation

Retaliation claims are analyzed using the *McDonnell Douglas* three-tier burden-shifting test discussed above. *Valentine v.Standard & Poors*, 50 F.Supp.2d 262, 281-82 (S.D.N.Y. 1999)(Citations and internal quotations omitted), *aff'd*, 205 F.3d 1327 (2d Cir. 2000). To establish a prima facie case of retaliation under Title VII, "a plaintiff must demonstrate participation in protected activity known to the defendant, an employment action disadvantaging the person engaged in the protected activity, and a causal connection between the protected activity and the adverse employment action." *Cruz v.*

*Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) (citations and internal quotations omitted). It is clear that "[t]he term 'protected activity' refers to action taken to protest or oppose statutorily prohibited discrimination." *Id.* at 566. In deciding whether a particular activity amounts to "protected activity," "the employment practices opposed by the plaintiff need not have actually amounted to a violation of Title VII. Rather, the plaintiff must have had a good faith, reasonable belief that the underlying challenged actions of the employer violated the law. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001). In the instant case, it is undisputed that Plaintiff engaged in protected activity by filing an EEO complaint.

To make a prima facie showing of an adverse employment action, the plaintiff must show that the employer's actions caused a materially adverse change in the terms and conditions of employment. In this regard, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Kessler v. Westchester County Dept. of Soc. Servs.*, 461 F.3d at 207 (*quoting Burlington N. & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S.Ct. 2405, 2415 (2006)). Moreover, "[w]hether a particular [action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id*. at 209.

To make a prima facie showing of a causal connection, a plaintiff may rely on mere temporal proximity between the protected activity and the adverse employment action.

However, once the employer comes forward with a legitimate non-discriminatory reason for the challenged action, mere temporal proximity is insufficient to carry the plaintiff's burden at the third step of the *McDonnell Douglas* analysis. *Bain v. Wal-Mart Stores, Inc.*, 585 F.Supp.2d 449, 454-455 (W.D.N.Y. 2008) ("It is well-settled that temporal proximity alone is insufficient to overcome an employer's legitimate, nondiscriminatory reason for terminating a plaintiff's employment.") (*citing Simpson v. New York State Dept. of Civil Services*, No. 05-1492-CV, 166 Fed.Appx. 499, 2006 WL 93011 at *2 (2d Cir. Jan. 9, 2006); other citations omitted). Moreover, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance America Corp.*, 248 F.3d 87, 95 (2d Cir. 2001).

Here, Plaintiff alleges three means of retaliation for filing an EEO complaint: 1) Patel gave her "a low rating on her proficiency report"; 2) Patel gave her "a letter of counseling [regarding abuse of sick leave] without a basis;"[17] and 3) Patel refused to credit her for treating other doctors' patients. (Plaintiff's Statement of Facts, ¶ 25, 72). In support of her contentions, Plaintiff alleges that, in or about August 2002, Patel learned that she had filed an EEO complaint. (Plaintiff's Response to Defendants' Statement of Facts, ¶ 21). She further alleges that, beginning shortly after the EEO complaint, during the period that she treated Dr. H's patients while he was out of work, she did not receive credit for treating those patients, "thus making it appear that [she] was seeing far few

---

[17]Plaintiff admits that Dr. H also received a letter of counseling regarding abuse of sick-leave, but alleges that even so, Dr. H "still receives outstanding grades in every classification." (Docket No. [24-12] at 9). However, as discussed above, Patel stated that he gave Dr. H a "low satisfactory" rating for dependability based on abuse of sick leave, and Plaintiff has not shown that she has any personal knowledge of Dr. H's rating.

patients than [her] male peers, which resulted in [her] being assigned more and more patients, including new patients whose initial screening is very time consuming." (Plaintiff's Statement of Facts, ¶ 25, 72).[18]  She then points to the fact that subsequently, on or about March 22, 2005, almost three years after the EEO complaint was filed, Patel issued Plaintiff a written letter of counseling regarding abuse of sick leave, purportedly because she had taken "10 days of unscheduled leave and three of those days were either on a Friday or Monday." *Id.*  On December 30, 2005, Patel issued her a Proficiency Report, and gave her a "low satisfactory" rating for the category of dependability, based on her alleged abuse of sick leave. Patel's overall rating of Plaintiff was "satisfactory."  Plaintiff did not suffer any further consequences as a result of the low dependability rating.

Based on the foregoing, the Court finds that Plaintiff cannot demonstrate a prima facie case of retaliation.  First, Plaintiff has not shown, by evidentiary proof in admissible form, that she was not credited for treating Dr. H's patients.  As to this issue, Plaintiff alleges that she was not "credited" for treating Dr. H's patients, and that such fact "impacted not only on the number of new patients [she] was assigned, but also on [her] chances for promotion." (Plaintiff's Aff. ¶ ¶ 18-19).  However, Plaintiff has failed to substantiate her claim that she was not "credited" for such work, and has also failed to show any connection between her temporary treatment of Dr. H's patients and the subsequent assignment of cases to her.  Nor has she produced any evidence that she was denied opportunities for promotion.  In any event, as discussed above, Patel was not

---

[18]In her Complaint in this action, Plaintiff alleges: "Plaintiff was not given credit for treating patients of Dr. H, and he was given credit for those patients that Plaintiff saw when Dr. H was away for several months and whenever he went on his extended vacations." (Complaint ¶ 106).

the person responsible for the assignment of Plaintiff's cases.

At most, Plaintiff has shown that she received a "low satisfactory" dependability rating, purportedly based on her abuse of sick leave. In that regard, "a negative job evaluation may constitute [an] adverse employment action *in certain circumstances*." *Sanders v. New York City Human Resources Admin.*, 361 F.3d 749, 756 (2d Cir. 2004) (emphasis added); *but see, Id.* (Holding that, where the plaintiff offered no proof that the evaluation had any effect on the terms and conditions of her employment, a jury could reasonably find that the negative evaluation, by itself, did not constitute a materially adverse employment action.). In this case, the Court finds that this low rating, contained in a performance review that was satisfactory overall, and which does not appear to have had any effect on Plaintiff's terms and conditions of employment, does not amount to an adverse employment action.

However, even assuming, *arguendo*, that the "low satisfactory" rating is sufficient to establish an adverse employment action, Plaintiff has not shown any causal connection between the rating and her filing of an EEO complaint years earlier. In that regard, Plaintiff cannot rely on mere temporal proximity, nor has she produced any other evidentiary proof in admissible form showing a connection between the two events. Nor can plaintiff demonstrate that she was singled out for such treatment, since Dr. H received the same rating for the same reason. Consequently, Defendants are entitled to summary judgment on Plaintiff's retaliation claim.

CONCLUSION

For the foregoing reasons, Defendants' motion [#18] is granted.  Plaintiff's EPA

claim is dismissed, and Defendants' are granted summary judgment on all of Plaintiff's

Title VII claims.  The Clerk of the Court is directed to close this file.

SO ORDERED.

Dated: Rochester, New York
         May 26, 2009

ENTER:


 /s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge